1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   NORTHFIELD INSURANCE                      No.  1:19-cv-00897-NONE-EPG
     COMPANY, an Iowa corporation,
12
                   Plaintiff,
13                                             ORDER GRANTING PLAINTIFF'S MOTION
            v.                                 FOR SUMMARY JUDGMENT
14
     SANDY'S PLACE, LLC, a California          (Doc. No. 24)
15   limited liability company, et al.,

16                 Defendants.

17

18          This is an insurance coverage dispute brought by plaintiff Northfield Insurance Company

19   against defendants Sandy's Place LLC, Sandy G. Self, Olen Self, Monico Alejandrez, and Rudy

20   Gallegos, Jr.  (Doc. No. 1, Compl.)  After a patron was shot multiple times outside of a bar called

21   "Sandy's Place," the patron sued defendants in state court for his injuries.  (*Id.* at ¶ 5.)  At the

22   time of the shooting, plaintiff insured defendant Sandy's Place LLC for bodily injury and

23   property damage.  (*Id.* at ¶ 4.)  Plaintiff tendered a defense in the state-court action while

24   reserving its right to deny coverage on the basis that the claims are excluded by a provision in the

25   policy regarding assault and battery.  (*Id.* at ¶ 6.)  Currently pending before the court is plaintiff's

26   motion for summary judgment, which seeks a declaratory ruling that it has no duty to defend the

27   state-court action and equitable reimbursement of defense costs.  (Doc. No. 24.)  For the reasons

28   set forth below, the motion for summary judgment will be granted in its entirety.

                                              1

1        **FACTUAL BACKGROUND**

2            Plaintiff and defendants submitted their own separate statements of facts in support and in

3   opposition to the pending motion for summary judgment.  Plaintiff states that defendants Sandy's

4   Place LLC, Sandy Self, and Olen Self refused to "stipulate to any of the proposed statement of

5   undisputed facts" on the basis that minimal discovery has been conducted in this case, making the

6   motion for summary judgment "premature and unfair."  (Doc. No. 29 at 4.)  The remaining two

7   defendants, Monico Alejandrez (who appears to be an insured but is not represented in this case)

8   and Rudy Gallegos (who is not an insured but is instead the plaintiff/victim in the state-court

9   action), did not respond in substance to the request to stipulate to undisputed facts for the

10  purposes of summary judgment.  (*Id.*)  The following facts are drawn from both statements of

11  undisputed facts and responses, and are supplemented by other evidence where appropriate.

12  **A.     The Shooting**

13            The Fresno Police Department conducted an investigation into the shooting that took

14  place at Sandy's Place in the early morning hours of November 25, 2018.  (Doc. Nos. 33-1

15  (Defendants' Statement of Facts and Plaintiff's Responses, "DSF") at ¶ 1; 31-3 at 48 (Law

16  Enforcement Report).)  Although the parties do not focus on the specifics of the shooting because

17  they are not material to the pending motion, they are provided for context here.  A security guard

18  working at Sandy's Place when the shooting occurred provided the following description to law

19  enforcement.  (*See* Doc. No. 31-3 at 59.)  Before the shooting, the shooter and another patron

20  angrily left Sandy's Place with two open bottles of alcohol.  (*Id.*)  Less than 30 minutes after they

21  left, the shooter returned in a vehicle and engaged in a verbal dispute with security staff at

22  Sandy's Place.  (*Id.*)  As the verbal dispute continued, another patron (*i.e.*, the victim) "was

23  standing nearby the doorway" and also engaged in a verbal dispute with the shooter.  (*Id.*)  The

24  shooter, who was still in the vehicle, held up a black handgun, said "Yeah what now?", and fired

25  several rounds at the victim who was standing by the door of Sandy's Place.  (*Id.*)

26            The following facts regarding the shooting are undisputed:  after leaving Sandy's Place,

27  the shooter returned about 19 minutes later in a white four-door sedan, (DSF at ¶¶ 2, 4); the

28  shooter was not on the "premises" of Sandy's Place at the time he fired the gun, (*id.* at ¶ 3); and

1  defendant Sandy's Place LLC did not have prior knowledge of or authorize the shooting, which

2  was "completely unexpected" from its perspective, (*id.* at ¶¶ 5–7.)

3  **B.     The Insurance Policy**

4        At the time of the shooting, plaintiff insured defendant Sandy's Place LLC with a

5  commercial policy covering general liability and property with an effective term running from

6  April 1, 2018 to April 1, 2019 (the "Policy").  (Doc. Nos. 31-1 (Plaintiff's Statement of Facts and

7  Defendants' Responses, "PSF") at ¶ 1; *see also* 26-1 at 2 (copy of the Policy).)  As relevant to the

8  pending motion, the Policy covers bodily injury:

9        **SECTION I – COVERAGES**

10       **COVERAGE  A  BODILY  INJURY  AND  PROPERTY
         DAMAGE LIABILITY**

11

12       **1. Insuring Agreement**

13       **a.** We will pay those sums that the insured becomes legally
         obligated to pay as damages because of "bodily injury" or "property
         damage" to which this insurance applies.  We have the right and
14       duty to defend the insured against any "suit" seeking those
         damages.  However, we will have no duty to defend the insured
15       against any "suit" seeking damages for "bodily injury" or "property
         damage" to which this insurance does not apply. . . .
16

         **b.** This insurance applies to "bodily injury" and "property damage"
17       only if . . . (1) The "bodily injury" or "property damage" is caused
         by an "occurrence" that takes place in the "coverage territory" [and]
18       (2) . . . during the policy period . . .

19       . . .

20       **SECTION V – DEFINITIONS**

21       . . .

22       **3.** "Bodily  injury"  means  bodily  injury,  sickness  or  disease
         sustained by a person, including death resulting from any of these at
23       any time.

24       . . .

25       **13.** "Occurrence"  means  an  accident,  including  continuous  or
         repeated  exposure  to  substantially  the  same  general  harmful
26       conditions.

27  (PSF at ¶ 2; *see also* Doc. No. 26-1 at 20, 31, 33.)

28  /////

                                      3

The Policy contains two exclusions:  the first for an assault or battery (the "Assault or Battery Exclusion") and the second for liquor liability (the "Liquor Liability Exclusion").  The Assault or Battery Exclusion states:

**SECTION I – COVERAGES**

. . .

**2. Exclusions**

This insurance does not apply to:

. . .

**EXCLUSION – ASSAULT OR BATTERY**

. . .

**1.** The following exclusion is added [to Policy § I, ¶ 2]

**Assault or Battery**

"Bodily injury" or "property damage" arising out of any act of "assault" or "battery" committed by any person, including any action or omission in connection with the prevention or suppression of such "assault" or "battery"

. . .

**3.** The following is added to the **DEFINITIONS** Section:

"Assault" means any attempt or threat to inflict injury to another, including any conduct that would reasonably place another in apprehension of such injury.

"Battery" means any intentional, reckless or offensive physical contact with, or any use of force against, a person without his or her consent that inflicts some injury, regardless of whether the resulting injury inflicted is intended or expected.

(PSF at ¶ 3 (admitting the existence of the exclusion but disputing "the suggestion that the policy is easily read and understood"); *see also* Doc. No. 26-1 at 20, 37.)  Further, the Policy contains an original exclusion concerning liquor liability coverage, which states in relevant part:

**SECTION I – COVERAGES**

. . .

**2. Exclusions**

This insurance does not apply to:

4

1   . . .

2   **c. Liquor Liability**

3   "Bodily injury" or "property damage" for which any insured may
be held liable by reason of:

4

5   (**1**) Causing or contributing to the intoxication of any person;

6   . . .

7   This exclusion only applies if you are in the business of
manufacturing, distributing, selling, serving or furnishing alcoholic
beverages.

8

9   (Doc. No. 26-1 at 20–21.)  However, an amendment replaces the original exclusion above with

10   the current Liquor Liability Exclusion:

11   **EXCLUSION – LIQUOR – ABSOLUTE**

12   The following replaces [Policy § I, ¶ 2(c)]

13   **c. Liquor Liability**

14   "Bodily injury or "property damage" for which any insured may be
held liable by reason of:

15

16   (**1**) Causing or contributing to the intoxication of any person,
including causing or contributing to the intoxication of any
person because alcoholic beverages were permitted to be
brought on your premises for consumption on your premises;

17

18   (PSF at ¶ 4 (admitting the existence of the exclusion but disputing "the suggestion that the policy

19   is easily read and understood"); Doc. No. 26-1 at 77.)

20   **C.      Tender of the Underlying Action**

21   The victim of the shooting, Rudy Gallegos Jr. (a named defendant in this action), filed a

22   lawsuit in state court against defendants Sandy Self, Olen Self, and Sandy's Place LLC asserting

23   claims for general negligence and premises liability: *Rudy Gallegos, Jr. v. Sandy G. Self, et al.*,

24   No. 19CECG00967 (Fresno County Superior Court) (the "Underlying Action").  (Doc. No. 26-5

25   at 3–9 (Underlying Action's Second Amended Complaint).)  In March 2019, defendant Sandy's

26   Place LLC tendered the original complaint in the Underlying Action to plaintiff for defense and

27   indemnity.  (PSF at ¶ 11.)  The original complaint asserted claims for general negligence and

28   premises liability against defendants Sandy Self, Olen Self, and Sandy's Place LLC, as well as an

1  intentional tort claim against the shooter.  (Doc. No. 26-2 at 2–11.)  The allegations in the original

2  complaint essentially contended that defendants could have taken additional steps to prevent the

3  the shooting and sought to hold them liable for the victim's injuries.  (*See id.* at 7–8; *see also* PSF

4  at ¶ 12.)  The next month, plaintiff responded to the tender offer by agreeing to defend defendants

5  Sandy's Place, LLC, Sandy G. Self, and Monico Alejandrez in the Underlying Action, while

6  reserving its rights to contest noncoverage and seek reimbursement of any costs associated with

7  the defense.  (PSF at ¶ 14; *see also* Doc. No. 26-3 (Reservation of Rights Letter).)  Although

8  defendant Sandy's Place LLC is the only named-insured, the parties agree that defendants Sandy

9  Self, Olen Self, and Monico Alejandrez "arguably have the rights of persons insured" under the

10  Policy and plaintiff treated the tender as though it was made on behalf of the business entity and

11  all three individuals.  (PSF at ¶ 13.)

12      In October 2019 several months after the tender, the victim (Rudy Gallegos Jr.) filed a

13  second amended, and the operative, complaint in the Underlying Action.  (Doc. No. 26-5.)  It

14  "alleges that the defendants are liable to plaintiff because they are responsible for his bodily

15  injury resulting from nine gun shots fired by a patron of Sandy's Place which struck him as he

16  was leaving the bar."  (PSF at ¶ 21.)  The second amended complaint filed in the underlying

17  action also now alleges that

18
19
20
21

> Defendants, SANDY G. SELF, OLEN SELF, AND SANDY'S PLACE LLC, negligently owned, operated, controlled, managed, and maintained SANDY'S PLACE, LLC by serving DEFENDANT GEORGE GREGORY GONZALES, alcoholic beverages, allowing said Defendant to become intoxicated and allowing a fight to occur on the premise which endangered other patrons, including Plaintiff causing him to be injured and suffer damages.

22  (*Id.* at ¶ 22.)  Plaintiff is currently paying for the legal defense of defendants Sandy Self, Olen

23  Self, Monico Alejandrez, and Sandy's Place LLC in the Underlying Action, and has done so since

24  the original complaint in the Underlying Action was filed.  (*Id.* at ¶ 23.)  At the time the pending

25  motion was filed, it was undisputed that plaintiff had paid, at that time, $7,818.48 in fees, costs,

26  and expenses to defend the defendants herein in the Underlying Action.  (*Id.* at ¶ 24.)  Plaintiff's

27  claim representative for the Underlying Action declares that these defense costs will continue to

28  increase.  (Doc. No. 24 (Declaration of Gail E. Crecelius) at 31.)

**D.     Assault or Battery Exclusion Added to the Policy From Year Prior**

Plaintiff insured defendant Sandy's Place with a prior policy from April 1, 2017 to April 1, 2018 (the "Prior Policy").  (PSF at ¶ 6.)  Defendants concede that while the Prior Policy included a separate "Liquor Liability Coverage Form" and a "Limited Assault or Battery Liability Coverage Form," the current Policy does not.  (*Id.* at ¶ 7 (disputing phrasing).)  During the term of the Prior Policy, it is undisputed that plaintiff informed defendant Sandy's Place that it was not willing to insure the bar for assault and battery—"and they understood that." (*Id.* at ¶ 8.)  It is also undisputed that during the term of the Prior Policy, insurance brokers working on behalf of defendant Sandy's Place LLC shopped for assault and battery coverage from other insurance companies.  (*Id.* at ¶ 9.)  Plaintiff submitted copies of several emails as evidence in support of this fact.  One email was sent by plaintiff's representatives on March 13, 2018 to defendant Sandy's Place LLC's insurance broker stating, in bonded and italicized lettering, that it would "no longer be able offer A&B coverage" under the current Policy.  (Doc. No. 27-4.)  Another email thread from several days later reflected that the broker was actively seeking coverage on behalf of defendant Sandy's Place LLC for assault and battery from other insurance companies.  (Doc. No. 27-6.)

In addition to seeking assault or battery coverage, it is undisputed that brokers working on behalf of defendant Sandy's Place LLC during the term of the Prior Policy also sought liquor liability coverage.  (PSF at ¶ 9.)  Plaintiff has submitted copies of emails as evidence in support of this contention.  On March 20, 2018, defendant Sandy's Place LLC submitted an application for liquor liability coverage to Illinois Union Insurance Company, which was approved on March 30, 2018.  (Doc. Nos. 27-7, 27-8.)  Thus, the parties do not dispute that defendant Sandy's Place LLC had a "Commercial Liquor Liability Policy" in effect beginning on April 1, 2018—which is the same effective date as the Policy at issue in this litigation.  (PSF at ¶ 10.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In summary judgment practice, the moving party "initially bears the burden of

7

1    proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d

2    376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

3    party may accomplish this by "citing to particular parts of materials in the record, including

4    depositions, documents, electronically stored information, affidavits or declarations, stipulations

5    (including those made for purposes of the motion only), admissions, interrogatory answers, or

6    other materials" or by showing that such materials "do not establish the absence or presence of a

7    genuine dispute, or that the adverse party cannot produce admissible evidence to support the

8    fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the

9    burden then shifts to the opposing party to establish that a genuine issue as to any material fact

10    actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

11    (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

12    not rely upon the allegations or denials of its pleadings but is required to tender evidence of

13    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

14    contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11;

15    *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider

16    admissible evidence in ruling on a motion for summary judgment.").  The opposing party must

17    demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the

18    suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W.

19    Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

20    dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the

21    nonmoving party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

22      In the endeavor to establish the existence of a factual dispute, the opposing party need not

23    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

24    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

25    trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

26    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

27    *Matsushita*, 475 U.S. at 587 (citations omitted).

28    /////

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

Through its complaint, plaintiff seeks: (1) declaratory relief that it had no duty to defend defendants Sandy's Place LLC, Sandy Self, Olen Self, and Monico Alejandrez in the Underlying Action and that plaintiff may withdraw from that action immediately; and (2) reimbursement of costs associated with defending defendants in the Underlying Action. (Compl. at 9.) In moving for summary judgment, plaintiff argues that the Underlying Action is not covered by the Policy because the Assault or Battery Exclusion applies and accordingly, equitable reimbursement is warranted pursuant to the California Supreme Court's decision in *Buss v. Superior Court*, 16 Cal. 4th 35 (1997). (Doc. Nos. 24 at 15–25; *see also* 33 at 9–10 (stating that the Liquor Liability Exclusion is only relevant to the extent the Assault or Battery Exclusion does not apply to bar coverage).) Defendants counter that the Assault or Battery Exclusion is not enforceable under California insurance law because it is inconspicuously placed within the Policy and the limitation is ambiguous as applied to the facts of the Underlying Action. (Doc. No. 31 at 12–14.) Because the court concludes that the Assault or Battery Exclusion precludes coverage with respect to the Underlying Action, it will not discuss whether the Liquor Liability Exclusion provides an additional basis for noncoverage.

/////

1    **A.      Plaintiff Has No Duty to Defend the Underlying Action**

2              The interpretation of an insurance policy is governed by state law.  *Humboldt Bank v. Gulf*

3    *Ins. Co.*, 323 F. Supp. 2d 1027, 1032 (N.D. Cal. 2004).  Under California law, the interpretation

4    of an insurance policy is a question of law to be determined by the court if there is no genuine

5    issue of material fact.  *See Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1150 (9th Cir. 1998)

6    ("based on the undisputed, material (*i.e.*, outcome-determinative) facts, liability arising out of the

7    attempted robbery and battery was not the result of an 'occurrence' and that Blue Ridge has no

8    duty to indemnify the Estate"); *Sprinkles v. Associated Indem. Corp.*, 188 Cal. App. 4th 69, 76

9    (2010) (stating that the interpretation of an insurance policy's exclusion is a question of law).

10             The ordinary rules of contractual interpretation apply to insurance policies.  *Palmer v.*

11   *Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999).  When interpreting an insurance policy, courts

12   must "look first to the language of the contract in order to ascertain its plain meaning or the

13   meaning a layperson would ordinarily attach to it."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1,

14   18 (1995); *see* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their

15   ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special

16   meaning is given to them by usage, in which case the latter must be followed.").  "The goal of

17   contractual interpretation is to determine and give effect to the mutual intention of the parties."

18   *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763 (2001).  When possible, courts must

19   "infer this intent solely from the written provisions of the insurance policy."  *Palmer*, 21 Cal. 4th

20   at 1115.  A policy's "clear and explicit" language "governs."  *Id.* (citation and internal quotations

21   omitted).  However, if the policy language is ambiguous, courts must interpret it consistent with

22   "the objectively reasonable expectations of the insured."  *Bank of the W. v. Superior Ct.*, 2 Cal.

23   4th 1254, 1264–65 (1992).  "A policy provision will be considered ambiguous when it is capable

24   of two or more constructions, both of which are reasonable."  *Waller*, 11 Cal. 4th at 18.

25   Language in a policy "must be interpreted as a whole, and in the circumstances of the case, and

26   cannot be found to be ambiguous in the abstract."  *Id.*  Therefore, courts should "not strain to

27   create an ambiguity where none exists."  *Id.*

28   /////

1    Further, "[a]n insurance company has the right to limit the coverage of a policy issued by

2    it and when it has done so, the plain language of the limitation must be respected." *Nat'l Ins.*

3    *Underwriters v. Carter*, 17 Cal. 3d 380, 386 (1976) (quoting *Continental Cas. Co. v. Phoenix*

4    *Constr. Co.*, 46 Cal. 2d 423, 432 (1956)).  Under California law, an enforceable exclusion or

5    limitation in an insurance policy must be "conspicuous, plain and clear." *Haynes v. Farmers Ins.*

6    *Exch.*, 32 Cal. 4th 1198, 1204 (2004).  As the California Supreme Court has held on several

7    occasions, "any exception to the performance of the basic underlying obligation must be so stated

8    as clearly to apprise the insured of its effect." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v.*

9    *Jacober*, 10 Cal. 3d 193, 202 (1973)).  It is the insurer's burden to demonstrate that an exclusion

10   or limitation in coverage is both "plain and clear" and "conspicuous." *Id.*  An exclusion that is

11   plain and clear is "stated precisely and understandably, in words that are part of the working

12   vocabulary of the average layperson," whereas a conspicuous exclusion is "placed and printed so

13   that it will attract the reader's attention." *Id.*  Put more simply, "[t]o be enforceable, a policy

14   provision limiting coverage otherwise reasonably expected under the policy must be so drafted

15   that a reasonable purchaser of insurance would have both noticed it and understood it." *Hervey v.*

16   *Mercury Cas. Co.*, 185 Cal. App. 4th 954, 966 (2010).  "While coverage clauses are interpreted

17   broadly, exclusionary clauses are construed narrowly against the insurer." *Marquez Knolls Prop.*

18   *Owner Ass'n, Inc. v. Exec. Risk Indem., Inc.*, 153 Cal. App. 4th 228, 233–34 (2007).

19   As relevant here, there is only one issue in dispute—whether the Assault or Battery

20   Exclusion was conspicuously placed within the Policy.  Defendants do not argue that the Assault

21   or Battery Exclusion is unclear as a general matter, only that it is ambiguous as applied to the

22   facts of the Underlying Action.  (Doc. No. 31 at 12–14.)  This argument will be addressed further

23   below where the court discusses whether the Underlying Action falls within the Assault or

24   Battery Exclusion.  The court will first answer whether the Assault or Battery Exclusion is both

25   "plain and clear" and "conspicuous" so as to be enforceable under California law.

26   1.    The Assault or Battery Exclusion is Plain, Clear, and Conspicuous.

27   The language of the Assault or Battery Exclusion appearing in the Policy in question is

28   clear.  Reading the exclusion as a whole, it states that the Policy's coverage "does not apply to . . .

11

1   'Bodily injury' or 'property damage' arising out of any act of 'assault' or 'battery' committed by

2   any person, including any act or omission in connection with the prevention or suppression of

3   such 'assault' or 'battery.'"  (*See* Doc. No. 26-1 at 20, 24, 37.)  The Policy provides definitions

4   for the terms "bodily injury," "property damage," "assault," and "battery."  (*Id.* at 31, 33, 37.)

5   The terms "bodily injury" and "battery" are material to this case.  First, although not entirely

6   helpful, the Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a

7   person, including death from any of these at any time."  (*Id.* at 31.)  Because the Policy does not

8   provide a precise definition of the words "bodily injury," the court will look to its "ordinary and

9   popular" meaning.  *AIU Ins. Co.*, 51 Cal. 3d at 825 (citation omitted).  One dictionary defines

10  bodily injury as "[p]hysical damage to a person's body."  *Injury*, BLACK'S LAW DICTIONARY

11  (11th ed. 2019).  Another defines it as "any damage to a person's physical condition including

12  pain or illness."  *Bodily injury*, MERIAM-WEBSTER, https://www.merriam-

13  webster.com/legal/bodily%20injury (last visited Mar. 26, 2021).  Under California criminal law,

14  the term "great bodily injury" refers to "a significant or substantial *physical injury*."  Cal. Penal

15  Code § 12022.7(f) (emphasis added).  As the term is generally understood, "bodily injury" means

16  some form of physical injury or damage to a person's body.  Second, the Policy defines the term

17  "battery" as the "intentional, reckless or offensive physical contact with, or any use of force

18  against, a person without his or her consent that inflicts some injury, regardless of whether the

19  resulting injury inflicted is intended or expected."  (Doc. No. 26-1 at 37.)[1]  As used in the Policy

20  and would be understood by the average layperson, a battery is an offensive contact causing some

21  injury.

22        Reading the Assault or Battery Exclusion as a whole, the Policy does not cover any

23  physical injury to a person's body "arising out of any" offensive physical contact by another

24  person or "any act or omission in connection with the prevention or suppression of such"

25  offensive physical contact.  (*Id.*)  The Assault or Battery Exclusion applies broadly, not just if the

26

27  _____

[1]  The court observes that "battery" as defined in the Policy is similar to the definition of criminal
battery under California law, which is "any willful and unlawful use of force or violence upon the

28  person of another."  Cal. Pen. Code § 242.

insured itself inflicts physical injury to a person's body through an offensive contact, but also if the insured could have prevented that injury by offensive contact from occurring in the first place. Although its limitation is broad, the Policy's Assault or Battery Exclusion is nonetheless plain and clear because "a reasonable purchaser of insurance would have . . . understood it."  *See Hervey*, 185 Cal. App. 4th at 966.  Indeed, defendants do not argue that the Assault or Battery Exclusion is ambiguous in general, likely because they cannot.  (*See* Doc. No. 31 at 13 ("[T]he question is whether, *in the particular context presented*, the insurance term or provision is capable of two or more constructions, both of which are reasonable." (emphasis added)).)

Defendants do contend that the Assault or Battery Exclusion is not conspicuously placed in the Policy.  (Doc. No. 31 at 12–13.)  Defendants argue that the entire Policy is over 130 pages in length and contains 21 separate amendments totaling 39 additional pages.  (*Id.* at 12.) According to defendants, the Policy "requires the average lay reader to sift through numerous intertwined endorsements to try and understand what it actually purchased" and they "should not be required to conduct such an arduous and specialized search to determine whether a claim . . . is . . . limited, restricted, or excluded."  (*Id.* at 12–13.)

An exclusion's conspicuousness "refers to how a coverage-limiting provision actually has been positioned and printed within the policy at issue."  *Haynes*, 32 Cal. 4th at 1209.  As noted above, an exclusion "must be placed and printed so that it will attract the reader's attention."  *Id.* at 1204.  Some relevant considerations include the location of where the exclusion appears in the policy, the exclusion's relation to the density of the entire policy, and whether the exclusion appears in any table of contents.  *See, e.g.*, *Brown v. Mid-Century Ins. Co.*, 215 Cal. App. 4th 841, 856–57 (2013); *but see Cal-Farm Ins. Co. v. TAC Exterminators, Inc.*, 172 Cal. App. 3d 564, 578 (1985) (instructing that exclusions should not be held invalid "merely because of the density of the verbiage").  With respect to the actual text of an exclusion or limitation, courts often consider several factors, including whether the exclusion's heading appears in capital letters, whether the exclusion's substance appears in larger or contrasting (e.g., font, color) text than the surrounding text, and whether the exclusion's language is set off from any surrounding text by any symbols or other indicators.  *See, e.g.*, *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 922–

13

23 (2009) (citing Cal. Com. Code § 1201(a)(10) to provide examples of "conspicuous" terms).

Here, the court concludes that the Assault or Battery Exclusion is conspicuously placed within the Policy.  First, the cover page of the Policy instructs the insured to "READ YOUR POLICY CAREFULLY" and explains that the Policy consists of schedules and endorsements. (Doc. No. 26-1 at 3.)  The Policy's table of contents, referred to as the schedule of forms and endorsements, is two pages and appears at pages eight and nine in the Policy.  (*Id.* at 8–9.)  The first page of the schedule lists "Exclusion – Assault or Battery."  (*Id.* at 8.)  The first page that substantively discusses coverage, the "Commercial General Liability Coverage Form," appears at page 20 and includes "Section I – Coverages" and subsection, "Coverage A Bodily Injury and Property Damage Liability."  (*Id.* at 20.)  Two paragraphs appear under subsection "Coverage A," the first paragraph titled, "**Insuring Agreement**," and the second titled, "**Exclusions**," which sets forth limitations on coverage.  (*Id.*)  However, as listed in the schedule, there are additional exclusions appearing on separate pages after the substantive part of the Policy.  The Assault or Battery Exclusion appears at page 37 and is a single page with no other provisions appearing on that page.  (*Id.* at 37.)  The header states in all capital letters that "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY."  (*Id.*)  In all-capital and boded lettering, the sub-header states, "**EXCLUSION – ASSAULT OR BATTERY,**" and then it states in partially bold-faced type that the Assault or Battery Exclusion is added to "Paragraph **2.**, **Exclusions**, of **SECTION I – COVERAGES – COVERAGE A BODILY INJURY AND PRIPERTY DAMAGE LIABILITY**[.]"  (*Id.*)  The exclusion then provides the substantive limitation in coverage.  (*Id.*)

Courts have concluded that similarly placed and labeled exclusions are conspicuous.  For example, an exclusion appearing on an attached page is conspicuous where the declarations page of a policy states that coverage is "as per form attached."  *See Merrill & Seeley, Inc. v. Admiral Ins. Co.*, 225 Cal. App. 3d 624, 631 (1990).  Likewise, an exclusion not appearing in the main body of the policy is nonetheless conspicuous where the cover page of the policy instructed the insured to "read your policy carefully" and stated that attached endorsements may limit coverage, the exclusion was one page long, and the exclusion's text was a reasonable size and contained

1   "bold-face, all-capital sub-headings." *See Palub v. Hartford Underwriters Ins. Co.*, 92 Cal. App.

2   4th 645, 652 (2001), *disapproved on other grounds by Julian v. Hartford Underwriters Ins. Co.*,

3   35 Cal. 4th 747 (2005).  In *CMS Security, Incorporated v. Burlington Insurance Company*—a

4   case with facts similar to the Policy at issue here—the Ninth Circuit affirmed a district court's

5   finding that an assault or battery exclusion was conspicuously placed within the policy at issue:

6           CMS's general liability policy includes an exclusion for claims
            arising out of intentional acts of assault or battery.  This exclusion
7           was conspicuous, because it was (1) identified by name in the
            listing of forms and endorsements at the beginning of the policy, (2)
8           set forth on its own separate page, (3) placed among other policy
            exclusions "where one would expect an insured to look to
9           determine the policy limits," and (4) labeled in boldfaced and
            enlarged lettering "so that it [would] attract the reader's attention."
10          . . . The exclusion is also plain and clear, because it states "precisely
            and understandably, in words that are part of the working
11          vocabulary of the average layperson," that it changes the policy to
            exclude coverage for claims arising out of assault or battery. . . .
12          The exclusion is therefore enforceable under California law.

13   434 Fed. App'x 613, 614 (9th Cir. 2011) (internal citations omitted).[2]  Conversely, courts have

14   held that an exclusion is not conspicuous where it is essentially buried within a policy in a manner

15   that would not "attract a reader's attention."  *See, e.g.*, *Haynes*, 32 Cal. 4th at 1206–11 (finding

16   the exclusion was not conspicuous where "declarations page [did] not reveal the subject matter or

17   substance" of the exclusion or otherwise alert insured that an exclusion amended the policy, and

18   where the exclusion was "surrounded by language that [had] nothing to do with exclusions or

19   limitations in coverage").

20          Here, the Policy's cover page instructs the insured to read the document carefully, the

21   schedule lists the Assault or Battery Exclusion, the exclusion appears on a single page with no

22   other provisions on that page, the exclusion is placed in the Policy where other exclusions are

23   placed, the exclusion's all-capital header states that the exclusion "CHANGES THE POLICY,"

24   the sub-header identifies the exclusion as concerning assault and battery using all-capital and

25   bold-faced lettering, and the exclusion identifies the paragraph of the Policy to which it is added

26   using bold-faced lettering.  This is sufficient to conclude that the Assault or Battery Exclusion is

27

28   [2]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1    conspicuously placed and printed within the Policy.  Despite defendants' argument to the

2    contrary, the Assault or Battery Exclusion is not a limitation buried in the Policy.  (*See* Doc. No.

3    31 at 12) (citing *Jauregui v. Mid-Century Ins. Co.*, 1 Cal. App. 4th 1544, 1549 (1991) (finding the

4    exclusion was not conspicuous where it was not placed under the sub-sections "Exclusions" or

5    "Limits on Liability," but instead below a sub-section titled "Other Insurance," even though "the

6    [] limitation has nothing to do with insurance form any other source").)  For these reasons, the

7    court concludes that the Assault or Battery Exclusion is enforceable because it is plain, clear, and

8    conspicuously placed within the Policy.

9              2.       The Underlying Action is Not Potentially Covered by the Policy

10        "[I]t is well established that an insurer has a duty to defend its insured when the action

11   brought against the insured potentially seeks damages within the coverage of the policy." *Martin*

12   *Marietta Corp. v. Ins. Co. of N. Am.*, 40 Cal. App. 4th 1113, 1122 (1995).  An insurer's "duty to

13   defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered

14   by the policy." *Waller*, 11 Cal. 4th at 19.  In determining whether a duty to defend exists, courts

15   must start by comparing "the allegations of the complaint with the terms of the policy." *Id.*  But

16   "[i]t has long been a fundamental rule of law that an insurer has a duty to defend an insured if it

17   becomes aware of . . . facts giving rise to the potential for coverage under the insuring

18   agreement." *Id.*  Therefore, any "[f]acts extrinsic to the complaint give rise to a duty to defend

19   when they reveal a possibility that the claim may be covered by the policy." *Id.*  Generally, this

20   duty is assessed "at the time of the tender of the defense." *B & E Convalescent Ctr. v. State*

21   *Comp. Ins. Fund*, 8 Cal. App. 4th 78, 92 (1992).  "Conversely, in an action wherein none of the

22   claims is even potentially covered, the insurer does not have a duty to defend." *Buss v. Superior*

23   *Ct.*, 16 Cal. 4th 35, 47 (1997).  "In other words, the insured need only show that the underlying

24   claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose Chem. Corp.*

25   *of Cal. v. Superior Ct.*, 6 Cal. 4th 287, 300 (1993).

26        Here, the Underlying Action alleges claims for general negligence and premises liability

27   against defendants Sandy's Place LLC, Sandy Self, Olen Self, and Monico Alejandrez.  (Doc. No.

28   26-5 at 4–9.)  The third claim, an intentional tort, is not asserted against any of the insureds, only

1   the shooter.  (*Id.* at 10.)  Therefore, the court will look only to the allegations of the first two

2   claims.  At the time of tender, the original complaint in the Underlying Action alleged that the

3   shooter intended to shoot an employee of Sandy's Place in retaliation of an earlier altercation, but

4   the victim was instead shot multiple times.  (Doc. No. 26-2 at 7–8.)  The second amended and

5   operative complaint now alleges that defendants "negligently owned, operated, controlled, and

6   managed" the bar "by serving" the shooter "alcoholic beverages" and "allowing [him] to become

7   intoxicated and allowing a fight to occur on the premise," which in turn caused the victim to be

8   shot.  (Doc. No. 26-5 at 6, 9.)

9            The claims for general negligence and premises liability in the Underlying Action are not

10  "even potentially covered" by the Policy because the Assault or Battery Exclusion applies.  *See*

11  *Buss*, 16 Cal. 4th at 47.  The entire basis for the Underlying Action is that a victim was shot near

12  the exit of Sandy's Place.  (*See generally* Doc. Nos. 26-2 at 2–11; 26-5.)  That is a battery, both as

13  defined in the Policy, (*see* Doc. No. 26-1 at 37 ("intentional, reckless or offensive physical

14  contact with, or any use of force against")), and also as defined by California law, *see* Penal Code

15  § 242 ("any willful and unlawful use of force or violence upon the person of another").  The fact

16  that the battery at Sandy's Place could also be charged as a "separate" criminal offense, as

17  defendants appear to contend, does not negate this conclusion.  (*See* Doc. No. 31 at 14) (citing

18  Cal. Pen. Code § 26100 (making it a felony to discharge a firearm from a vehicle)).  Regardless,

19  the definition as used in the Policy governs.  Applying the Policy's definition here, the shooting

20  outside of Sandy's Place was, at the least, an "offensive physical contact with" the victim

21  "without his . . . consent that inflict[ed] some injury[.]"  (*See* Doc. No. 26-1 at 37.)  Although it is

22  undisputed that defendant Sandy's Place LLC did not have knowledge of, authorize, or expect the

23  shooting, (DSF at ¶¶ 5–7), under the Policy's definition of battery, it is irrelevant whether the

24  "resulting injury inflicted [wa]s intended or expected[,]" (Doc. No. 26-1 at 37.)  Given that the

25  shooting outside of Sandy's Place was a battery as that term is defined in the Policy, it is clear

26  that the Assault or Battery Exclusion precludes coverage with respect to the Underlying Action.

27  The Assault or Battery Exclusion limits coverage for any "'bodily injury' . . . arising out of . . .

28  any act or omission in connection with the prevention or suppression of" a battery.  (*See id.* at 20,

17

1   37.)  The Underlying Action seeks to hold defendants liable for precisely that.  In that action, the

2   victim alleges that his bodily injury "ar[ose] out of" defendants' "act[s] or omission[s] in

3   connection with" preventing the shooting.  (*See id.*; Doc. Nos. 26-2 (Original Complaint) at 7–8

4   (alleging employee was intended victim after engaging in an altercation with the shooter earlier in

5   the night); 26-5 (Second Amended Complaint) at 4–9 (alleging shooting occurred because

6   defendants allowed shooter to become intoxicated).)  It is not defendants' alleged negligence—

7   whether it is the employee's altercation or defendants' service of alcohol—by itself which

8   precludes coverage of the Underlying Action.  Instead, it is the fact that the victim suffered

9   physical injuries "arising out of" that allegedly negligent conduct which bars coverage under the

10  Assault or Battery Exclusion of the Policy.  Because the allegations in the Underlying Action

11  against defendants Sandy's Place LLC, Sandy Self, Olen Self, and Monico Alejandrez fall

12  squarely within the Assault or Battery Exclusion, plaintiff has no duty to defend.

13          As plaintiff points out, courts have held that assault or battery exclusions bar coverage for

14  similar incidents.  For example, in *Zelda, Incorporated v. Northland Insurance Company*, the

15  California Court of Appeal affirmed a trial court's conclusion that an insurer had no duty to

16  defend an underlying lawsuit arising from an assault on a patron because it "fell squarely within

17  the exclusion" for assault and battery, which barred coverage for "bodily injury . . . arising out of

18  assault or battery, or out of any act or omission in connection with the prevention or suppression

19  of an assault or battery."  56 Cal. App. 4th 1252, 1260–62 (1997) (providing no definition for

20  assault or battery).  Likewise, in *Mount Vernon Fire Insurance Corporation v. Oxnard*

21  *Hospitality Enterprise, Incorporated*, the state appellate court affirmed a trial court's

22  determination that the insured had no duty to defend an underlying action arising from an incident

23  where a patron threw flammable liquid on an employee and set her on fire because the assault and

24  battery exclusion of the policy applied and that exclusion barred coverage for ""all 'bodily injury'

25  . . . arising out of . . . 'battery' . . . including but not limited to . . . 'battery' arising out of or

26  caused in whole or in part by negligence . . ."  219 Cal. App. 4th 876, 881–84 (2013) (defining

27  battery as the "negligent or intentional physical contact with another without consent that results

28  in physical or emotional injury").

1      Defendants' attempt to distinguish these cases is unpersuasive.  First, defendants appear to

2  argue that because the shooting outside of Sandy's Place did not involve an employee, the cases

3  discussed above are distinguishable.  (*See* Doc. No. 31 at 14.)  However, the Assault or Battery

4  Exclusion precludes coverage for battery "committed by *any* person" and it provides no limitation

5  on who the victim may be, so long as it is "a person[.]"  (*See* Doc. No. 26-1 at 37 (emphasis

6  added).)  Second, defendants contend that the shooting itself did not occur on the "premises" of

7  Sandy's Place because the shooter was in a car in the parking lot and the victim was standing near

8  the exit of the bar, whereas the cases discussed above involved a battery occurring inside the

9  establishment.  (*See* Doc. No. 31 at 14.)  It is undisputed that "[t]he shooting incident did not

10  occur while the shooter was on Sandy's Place's premises."  (DSF at ¶ 3.)  But that does not help

11  defendants, nor do they explain how it could.  The Policy covers "bodily injury" occurring in the

12  "[c]overage territory," which in turn is defined as "[t]he United States of America" and defined

13  even more broadly under certain other circumstances.  (*See* Doc. No. 26-1 at 20, 33.)

14  Importantly, the Policy excludes coverage for bodily injury arising out of an assault or battery

15  *with no geographical limitation*, meaning it is irrelevant under the plain language of the Policy

16  whether an assault or battery technically occurred right outside of the "premises" of Sandy's

17  Place.  Bodily injury that otherwise might be insured by the Policy is excluded from coverage if it

18  arose out of *any* assault or battery.  Defendants do not—and cannot—point to any portion of the

19  Policy supporting their contention that the location of the shooter is material for purposes of

20  resolving the pending motion for summary judgment.

21      Finally, defendants argue that adjudication of the pending motion is improper at this time

22  because discovery has yet to be completed in this case.  (Doc. No. 31 at 4–5.)  Of course, the

23  court may defer a ruling on a motion until the completion of additional discovery if the non-

24  moving party "shows by affidavit or declaration, for specified reasons, it cannot present facts

25  essential to justify its opposition" to summary judgment. Fed. R. Civ. P. 56(d).  However, the

26  party seeking discovery has the burden "to proffer sufficient facts to show that the evidence

27  sought exists and that it would prevent summary judgment." *Nidds v. Schindler Elevator Corp.*,

28  113 F.3d 912, 921 (9th Cir. 1996).  Defendants fail to carry that burden here.  Notably, defendants

1    have not submitted any declarations or affidavits in support, but instead merely argue in

2    conclusory fashion that some of the documents still need to be authenticated, such as law

3    enforcement reports from the Fresno Police Department, and additional time is needed to pursue

4    any evidentiary objections.  (Doc. No. 31 at 5.)  Defendants, however, do not explain how those

5    documents—even assuming any evidentiary objection they might raise were to be sustained—

6    could help them defeat summary judgment.  Defendants do not contest the authenticity of the

7    Policy or the complaints filed in the Underlying Action, which are the two material pieces of

8    evidence the court has relied upon in finding that plaintiff has no duty to defend under the Policy.

9    The Underlying Action "precludes coverage, as discussed above, and each of the alleged acts or

10   omissions of the [defendants] falls within the Assault [or] Battery Exclusion.  Thus, extrinsic

11   evidence is unnecessary to conclude that [plaintiff] has no duty to defend."  *Colony Ins. Co. v.*

12   *Oberoi*, No. CV 17-1476, 2017 WL 6888296, at *4 (C.D. Cal. Dec. 11, 2017).

13        For these reasons, plaintiff's motion for summary judgment with respect to its first

14   claim—which seeks a declaratory ruling that it has no duty to defend the Underlying Action and

15   that it may withdraw from that action immediately—will be granted.

16   **B.    Plaintiff is Entitled to Reimbursement for Defending the Underlying Action**

17        Because of the risks posed to insurers in declining coverage, it is well established under

18   California law that an insurer may tender a defense of a third-party suit involving the insured

19   while reserving its right to assert noncoverage of the claim under the insurance policy at a later

20   time.  *See Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498 (2001).  If an insurer tenders a

21   defense and adequately reserves its rights, it "may indeed seek reimbursement for defense costs"

22   for any claims in an underlying action that are not covered by the insurance policy.  *Buss*, 16 Cal.

23   4th at 49.  This is because "California law clearly allows insurers to be reimbursed for attorney's

24   fees and other expenses paid in defending insureds against claims for which there was no

25   obligation to defend."  *Id.*  "Because the right is the insurer's alone[,]" an insurer may reserve its

26   rights unilaterally.  *Id.* at 61 n.27.  Nevertheless, an insurer must generally reserve its right at the

27   earliest possible time.  An insurer may waive its right to deny coverage on grounds that were

28   known or should have been known to it at the time it tendered a defense if it failed to reserve its

1    rights.  *See Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 322, 330 (1980).

2          Defendants do not contest the propriety of plaintiff seeking reimbursement for defending

3    the Underlying Action apart from arguing that there was a duty to defend—which the court has

4    concluded there was not.  The original complaint in the Underlying Action was tendered to

5    plaintiff for defense on March 21, 2019.  (Doc. No. 26-2.)  About a month later, on April 22,

6    2019, plaintiff agreed to tender a defense in the Underlying Action under a reservation of rights

7    on the basis that both the Assault or Battery Exclusion and Liquor Liability Exclusion precluded

8    coverage.  (Doc. No. 26-3.)  The reservation of rights later explicitly stated that plaintiff "reserves

9    the right to recover . . . any payments made . . . regarding this action, including payments made

10   for indemnity, attorney's fees, defense costs and expenses."  (*Id.* at 6.)  It is undisputed that

11   plaintiff has spent $7,818.48 defending the Underlying Action on behalf of defendants from the

12   date that case was filed to the date plaintiff moved for summary judgment in this case.  (PSF ¶ 24;

13   *see also* Doc. No. 28-10.)

14         Plaintiff is therefore entitled to equitable reimbursement in an amount of $7,818.48

15   because the Underlying Action is not potentially covered by the Policy and because plaintiff

16   tendered a defense while adequately reserving its right to contest coverage.  Accordingly,

17   plaintiff's motion for summary judgment on its second claim for relief—seeking the

18   reimbursement of all fees, costs, and expenses spent to defend the Underlying Action—will also

19   be granted.

20                                **CONCLUSION**

21         For all of the reasons explained above, plaintiff's motion for summary judgment (Doc.

22   No. 24) is granted in its entirety.

23   IT IS SO ORDERED.

24      Dated:   __**March 31, 2021**__                        _____

25                                                   UNITED STATES DISTRICT JUDGE

26

27

28
                                        21